| STATE OF MINNESOTA | DISTRICT COURT |
|---|---|
| COUNTY OF HENNEPIN | FOURTH JUDICIAL DISTRICT |

| | Personal Injury |
|---|---|
| RODNEY BELL, ET AL, | |
| Plaintiffs, | **SUMMONS** |
| v. | |
| 3M COMPANY and | |
| AEARO TECHNOLOGIES LLC, | |
| Defendants. | |

THIS SUMMONS IS DIRECTED TO:    3M Company

1. **YOU ARE BEING SUED.** The Plaintiffs have started a lawsuit against you. The Plaintiffs' Complaint against you is attached to this Summons. Do not throw these papers away. They are official papers that affect your rights. You must respond to this lawsuit even though it may not yet be filed with the Court and there may be no court file number on this Summons.

2. **YOU MUST REPLY WITHIN 21 DAYS TO PROTECT YOUR RIGHTS.** You must give or mail to the person who signed this Summons a written response called an Answer within 21 days of the date on which you received this Summons. You must send a copy of your Answer to the person who signed this Summons located at:

    Schwebel Goetz & Sieben
    5120 IDS Center
    80th S. 8th Street
    Minneapolis, Minnesota 55402

3. **YOU MUST RESPOND TO EACH CLAIM.** The Answer is your written response to the Plaintiffs' Complaint. In your Answer you must state whether you agree or disagree with each paragraph of the Complaint. If you believe the Plaintiffs should not be given everything asked for in the Complaint, you must say so in your Answer.

1

4. **YOU WILL LOSE YOUR CASE IF YOU DO NOT SEND A WRITTEN RESPONSE TO THE COMPLAINT TO THE PERSON WHO SIGNED THIS SUMMONS.** If you do not Answer within 21 days, you will lose this case. You will not get to tell your side of the story, and the Court may decide against you and award the Plaintiffs everything asked for in the Complaint. If you do not want to contest the claims stated in the Complaint, you do not need to respond. A default judgment can then be entered against you for the relief requested in the Complaint.

5. **LEGAL ASSISTANCE.** You may wish to get legal help from a lawyer. If you do not have a lawyer, the Court Administrator may have information about places where you can get legal assistance. **Even if you cannot get legal help, you must still provide a written Answer to protect your rights or you may lose the case.**

6. **ALTERNATIVE DISPUTE RESOLUTION.** The parties may agree to or be ordered to participate in an alternative dispute resolution process under Rule 114 of the Minnesota General Rules of Practice. You must still send your written response to the Complaint even if you expect to use alternative means of resolving this dispute.

## ACKNOWLEDGMENT

The undersigned acknowledge sanctions may be imposed under Minn. Stat. § 549.211.

Dated:  January 19, 2021

**SCHWEBEL GOETZ & SIEBEN, P.A.**
*/s/ Alicia N. Sieben*
William R. Sieben (#100808)
Alicia N. Sieben (#389640)
Matthew J. Barber (#397240)
5120 IDS Center
80 South Eighth Street
Minneapolis, Minnesota 55402-2246
Telephone:  (612) 377-7777
Fax: 612-333-6311
bsieben@schwebel.com
asieben@schwebel.com
mbarber@schwebel.com

Respectfully Submitted,

**PAUL LLP**
Richard M. Paul III (*pro hac forthcoming*)
Ashlea G. Schwarz (*pro hac forthcoming*)
601 Walnut Street, Suite 300
Kansas City, Missouri 64106
Telephone: (816) 984-8100
Rick@PaulLLP.com
Ashlea@PaulLLP.com

**GUSTAFSON GLUEK PLLC**
Daniel E. Gustafson (#202241)
Amanda M. Williams (#341691)
120 South 6th Street, Suite 2600
Minneapolis, Minnesota 54402
Phone: (612) 333-8844
dgustafson@gustafsongluek.com
awilliams@gustafsongluek.com

**ATTORNEYS FOR PLAINTIFFS**

STATE OF MINNESOTA                                        DISTRICT COURT
COUNTY OF HENNEPIN                                  FOURTH JUDICIAL DISTRICT

                                                              Personal Injury

| | |
|---|---|
| RODNEY BELL, LLOYD CARMON, CURTIS CHANNELL, MELCHOR ESQUIVEL, CARNAM FREEMAN, MICHAEL GILMORE, JAMES HOGAN, SHIMIRIA KENNARD, CHRISTOPHER KING, JASON LAMBETH, TAMA LIVI, JEREMIAH MONTES, CLIFFORD MYLES, FERNANDO NINO, SILVIO OLIVARES, ASHLEY ORDES, BRETT PORTER, RUSSELL POWELL, JAMES RABY, JACOB SEGOVIA, DAVID SLOAS, TIFFANY SMITH, BENNETT SNODDY, ROSE STINSON, STANLEY TACKETT, RICHARD ZAKARIAN, and ARTURO ZAMORA, | **COMPLAINT** |
| Plaintiffs, | |
| v. | |
| 3M COMPANY and AEARO TECHNOLOGIES LLC, | |
| Defendants. | |

Plaintiffs bring this action against defendants 3M Company and Aearo Technologies

LLC, and in support thereof alleges:

### NATURE OF THE CASE

1. This is a failure to warn product liability action related to an earplug

manufactured and sold by Defendants. Plaintiffs used Defendants' dual-ended Combat

1

Arms™ Earplugs - Version 2 and, as a result of Defendants' failure to warn, now suffer from hearing loss and tinnitus. Defendants knew the earplugs needed to be inserted in a particular manner in order to have any effectiveness. But the Defendants failed to warn potential purchasers of the danger of failing to do so.

JURISDICTION AND VENUE

2.     This Court has subject matter jurisdiction over Plaintiffs' claims under Minn. Stat. § 484.01, subd. 1.

3.     This action is not removable to federal court because Plaintiffs assert no claim arising under the Constitution, law, or treaties of the United States to satisfy 28 U.S.C. § 1331 and because even though the requirements of 28 U.S.C. § 1332(a) may be met, Plaintiffs bring this suit in Defendants' home state and therefore 28 U.S.C. § 1441(b)(2) precludes removal.

4.     Venue is proper in Hennepin County, Minnesota under Minn. Stat. §§ 542.01 and 542.09 because 3M resides in Hennepin County in that it has its resident agent, an office, and a place of business in Hennepin County.

PARTIES

5.     Plaintiff Rodney Bell is an individual residing in the state of Pennsylvania.

6.     Plaintiff Lloyd Carmon is an individual residing in the state of Ohio.

7.     Plaintiff Curtis Channell is an individual residing in the state of Texas.

8.     Plaintiff Melchor Esquivel is an individual residing in the state of Texas.

2

9.    Plaintiff Carnam Freeman is an individual residing in the state of Missouri.

10.   Plaintiff Michael Gilmore is an individual residing in the state of Pennsylvania.

11.   Plaintiff James Hogan is an individual residing in the state of Oregon.

12.   Plaintiff Shimiria Kennard is an individual residing in the state of Louisiana.

13.   Plaintiff Christopher King is an individual residing in the state of Kentucky.

14.   Plaintiff Jason Lambeth is an individual residing in the state of Oklahoma.

15.   Plaintiff Tama Livi is an individual residing in the state of California.

16.   Plaintiff Jeremiah Montes is an individual residing in the state of Oregon.

17.   Plaintiff Clifford Myles is an individual residing in the state of West Virginia.

18.   Plaintiff Fernando Nino is an individual residing in the state of Texas.

19.   Plaintiff Silvio Olivares is an individual residing in the state of Texas.

20.   Plaintiff Ashley Ordes is an individual residing in the state of Alabama.

21.   Plaintiff Brett Porter is an individual residing in the state of Indiana.

22.   Plaintiff Russell Powell is an individual residing in the state of Missouri.

23.   Plaintiff James Raby is an individual residing in the state of Colorado.

24.   Plaintiff Jacob Segovia is an individual residing in the state of Texas.

25.   Plaintiff David Sloas is an individual residing in the state of Kentucky.

26.   Plaintiff Tiffany Smith is an individual residing in the state of Georgia.

27.   Plaintiff Bennett Snoddy is an individual residing in the state of South Carolina.

28.   Plaintiff Rose Stinson is an individual residing in the state of Florida.

29.    Plaintiff Stanley Tackett is an individual residing in the state of Kentucky.

30.    Plaintiff Richard Zakarian is an individual residing in the state of Texas.

31.    Plaintiff Arturo Zamora is an individual residing in the state of Oregon.

32.    Defendant 3M is a Delaware corporation with its principal place of business in Minnesota.

33.    Defendant Aearo Technologies LLC is a limited liability company formed in Delaware with its principal place of business in Minnesota.

FACTUAL ALLEGATIONS

A. **Plaintiffs' Use of 3M Combat Arms™ Earplugs Version 2**

*Rodney Bell*

34.    Plaintiff Bell worked as a factory operator for Hubble Lighting from 2007 to 2009; Firmatage from 2017 to 2018; and for Mell Chemicals from 2018 to 2019. His responsibilities included working around louds presses, boilers, and other hydraulic equipment.

35.    Plaintiff Bell wore the 3M dual-ended earplugs during his employment. During such times, Plaintiff Bell was exposed to damaging, loud impulse, high-pitched sounds.

36.    Plaintiff Bell did not receive instructions to fold back the third flange on the opposite side of the use end of the 3M dual-ended earplug or a warning that the earplug would not be effective if he did not do so.

37.    Plaintiff Bell suffers from hearing loss and tinnitus.

*Lloyd Carmon*

38.   Plaintiff Carmon worked as a general laborer for Total Safety from approximately 2008 to 2009. His responsibilities included working near water blast pumps, vacuum trucks, and other heavy equipment for extended periods of time.

39.   Plaintiff Carmon wore the 3M dual-ended earplugs during his employment. During such times, Plaintiff Carmon was exposed to damaging, loud impulse, high-pitched sounds.

40.   Plaintiff Carmon did not receive instructions to fold back the third flange on the opposite side of the use end of the 3M dual-ended earplug or a warning that the earplug would not be effective if he did not do so.

41.   Plaintiff Carmon suffers from hearing loss and tinnitus.

*Curtis Channell*

42.   Plaintiff Channell worked as a general laborer for Brock Services, LLC from approximately 2003 to 2015. His responsibilities included driving a forklift, hammering, and drilling while building scaffolds in an industrial environment.

43.   Plaintiff Channell wore the 3M dual-ended earplugs during his employment. During such times, Plaintiff Channell was exposed to damaging, loud impulse, high-pitched sounds.

44.   Plaintiff Channell did not receive instructions to fold back the third flange on the opposite side of the use end of the 3M dual-ended earplug or a warning that the earplug would not be effective if he did not do so.

45.   Plaintiff Channell suffers from hearing loss and tinnitus.

*Melchor Esquivel*

46.   Plaintiff Esquivel worked as a truck driver for General Motors and Ford from at least 1999 to 2010. His responsibilities included delivering auto parts and working around heavy machinery and equipment found in an assembly factory.

47.   Plaintiff Esquivel wore the 3M dual-ended earplugs during his employment. During such times, Plaintiff Esquivel was exposed to damaging, loud impulse, high-pitched sounds.

48.   Plaintiff Esquivel did not receive instructions to fold back the third flange on the opposite side of the use end of the 3M dual-ended earplug or a warning that the earplug would not be effective if he did not do so.

49.   Plaintiff Esquivel suffers from hearing loss.

*Carnam Freeman*

50.   Plaintiff Freeman worked as a carpenter for ClayCo and McCarthy Building Companies, Inc., from approximately 2005 to 2017. His responsibilities included working with heavy equipment and machinery in an industrial environment for extended periods of time.

51.   Plaintiff Freeman wore the 3M dual-ended earplugs during his employment. During such times, Plaintiff Freeman was exposed to damaging, loud impulse, high-pitched sounds.

52.   Plaintiff Freeman did not receive instructions to fold back the third flange on the opposite side of the use end of the 3M dual-ended earplug or a warning that the earplug would not be effective if he did not do so.

53.   Plaintiff Freeman suffers from hearing loss.

**Michael Gilmore**

54.   Plaintiff Gilmore worked as a foreman for Amtrak from at least 2009 to 2013. His responsibilities included working with rail saws and other heavy equipment and machinery for extended periods of time.

55.   Plaintiff Gilmore wore the 3M dual-ended earplugs during his employment. During such times, Plaintiff Gilmore was exposed to damaging, loud impulse, high-pitched sounds.

56.   Plaintiff Gilmore did not receive instructions to fold back the third flange on the opposite side of the use end of the 3M dual-ended earplug or a warning that the earplug would not be effective if he did not do so.

57.   Plaintiff Gilmore suffers from hearing loss and tinnitus.

*James Hogan*

58.  Plaintiff Hogan worked as a laborer for Timber Products Co. (f/k/a US Forest Industries) from approximately 1989 to 2004. His responsibilities included wood milling and operating industrial saws for extended periods of time.

59.  Plaintiff Hogan wore the 3M dual-ended earplugs during his employment. During such times, Plaintiff Hogan was exposed to damaging, loud impulse, high-pitched sounds.

60.  Plaintiff Hogan did not receive instructions to fold back the third flange on the opposite side of the use end of the 3M dual-ended earplug or a warning that the earplug would not be effective if he did not do so.

61.  Plaintiff Hogan suffers from hearing loss and tinnitus.

*Shimiria Kennard*

62.  Plaintiff Kennard worked as a laborer for PK Safety from approximately 2013 to 2014 and for Turner Industries from approximately 2015 to 2016. Her responsibilities included working with industrial compressors, saws, drills, and other heavy equipment for extended periods of time.

63.  Plaintiff Kennard wore the 3M dual-ended earplugs during her employment. During such times, Plaintiff Kennard was exposed to damaging, loud impulse, high-pitched sounds.

8

64.    Plaintiff Kennard did not receive instructions to fold back the third flange on the opposite side of the use end of the 3M dual-ended earplug or a warning that the earplug would not be effective if she did not do so.

65.    Plaintiff Kennard suffers from hearing loss and tinnitus.

**Christopher King**

66.    Plaintiff King worked as a production associate for Smithfield Packing Co., from approximately 2007 to 2011. His responsibilities included working with heavy equipment and machinery in an industrial environment for extended periods of time.

67.    Plaintiff King wore the 3M dual-ended earplugs during his employment. During such times, Plaintiff King was exposed to damaging, loud impulse, high-pitched sounds.

68.    Plaintiff King did not receive instructions to fold back the third flange on the opposite side of the use end of the 3M dual-ended earplug or a warning that the earplug would not be effective if he did not do so.

69.    Plaintiff King suffers from hearing loss and tinnitus.

**Jason Lambeth**

70.    Plaintiff Lambeth worked as a Coil Tubing Operator for Cudd Pressure Control, Inc. from approximately 1995 to 2010. His responsibilities included working with heavy equipment and machinery in an industrial environment for extended periods of time.

71.   Plaintiff Lambeth wore the 3M dual-ended earplugs during his employment. During such times, Plaintiff Lambeth was exposed to damaging, loud impulse, high-pitched sounds.

72.   Plaintiff Lambeth did not receive instructions to fold back the third flange on the opposite side of the use end of the 3M dual-ended earplug or a warning that the earplug would not be effective if he did not do so.

73.   Plaintiff Lambeth suffers from hearing loss and tinnitus.

*Tama Livi*

74.   Plaintiff Livi worked as a driver for Wholesale Distribution Services from approximately 2013 to 2018. His responsibilities included working in industrial loading zones around heavy equipment and machinery for extended periods of time.

75.   Plaintiff Livi wore the 3M dual-ended earplugs during his employment. During such times, Plaintiff Livi was exposed to damaging, loud impulse, high-pitched sounds.

76.   Plaintiff Livi did not receive instructions to fold back the third flange on the opposite side of the use end of the 3M dual-ended earplug or a warning that the earplug would not be effective if he did not do so.

77.   Plaintiff Livi suffers from hearing loss and tinnitus.

*Jeremiah Montes*

78.   Plaintiff Montes worked as a laborer for All Roofs Northwest from at least 2010 to 2019 His responsibilities included working in a machine shop around industrial generators and other heavy machinery for extended periods of time.

79.   Plaintiff Montes wore the 3M dual-ended earplugs during his employment. During such times, Plaintiff Montes was exposed to damaging, loud impulse, high-pitched sounds.

80.   Plaintiff Montes did not receive instructions to fold back the third flange on the opposite side of the use end of the 3M dual-ended earplug or a warning that the earplug would not be effective if he did not do so.

81.   Plaintiff Montes suffers from tinnitus.

*Clifford Myles*

82.   Plaintiff Myles worked as a laborer for Universal Coal from approximately 2009 to 2012. His responsibilities included working around industrial vibrators and other heavy equipment in mines for extended periods of time.

83.   Plaintiff Myles wore the 3M dual-ended earplugs during his employment. During such times, Plaintiff Myles was exposed to damaging, loud impulse, high-pitched sounds.

84. Plaintiff Myles did not receive instructions to fold back the third flange on the opposite side of the use end of the 3M dual-ended earplug or a warning that the earplug would not be effective if he did not do so.

85. Plaintiff Myles suffers from hearing loss and tinnitus.

*Fernando Nino*

86. Plaintiff Nino worked as a repair technician for Pratt & Whitney from approximately 1996 to 2015. His responsibilities included working with air hammers, air drills, hydraulic rams, hydraulic wrenches, and other high-pressured tools for extended periods of time.

87. Plaintiff Nino wore the 3M dual-ended earplugs during his employment. During such times, Plaintiff Nino was exposed to damaging, loud impulse, high-pitched sounds.

88. Plaintiff Nino did not receive instructions to fold back the third flange on the opposite side of the use end of the 3M dual-ended earplug or a warning that the earplug would not be effective if he did not do so.

89. Plaintiff Nino suffers from hearing loss and tinnitus.

*Silvio Olivares*

90. Plaintiff Olivares worked as a supervisor for TS Moore Printing from approximately 2001 to 2010. His responsibilities included working with industrial printing equipment and machinery for extended periods of time.

91.   Plaintiff Olivares wore the 3M dual-ended earplugs during his employment. During such times, Plaintiff Olivares was exposed to damaging, loud impulse, high-pitched sounds.

92.   Plaintiff Olivares did not receive instructions to fold back the third flange on the opposite side of the use end of the 3M dual-ended earplug or a warning that the earplug would not be effective if he did not do so.

93.   Plaintiff Olivares suffers from hearing loss and tinnitus.

*Ashley Ordes*

94.   Plaintiff Ordes worked as a carpet manufacturer at Shaw Industries from at least 2014 to 2016. Her responsibilities included working around heavy equipment and machinery.

95.   Plaintiff Ordes wore the 3M dual-ended earplugs during her employment. During such times, Plaintiff Ordes was exposed to damaging, loud impulse, high-pitched sounds.

96.   Plaintiff Ordes did not receive instructions to fold back the third flange on the opposite side of the use end of the 3M dual-ended earplug or a warning that the earplug would not be effective if she did not do so.

97.   Plaintiff Ordes suffers from hearing loss.

13

*Brett Porter*

98.   Plaintiff Porter worked as a forklift operator for Rochester Metal Products Corporation from approximately 2013 to 2015. His responsibilities included operating a forklift around heavy machinery and equipment for extended periods of time.

99.   Plaintiff Porter wore the 3M dual-ended earplugs during his employment. During such times, Plaintiff Porter was exposed to damaging, loud impulse, high-pitched sounds.

100.   Plaintiff Porter did not receive instructions to fold back the third flange on the opposite side of the use end of the 3M dual-ended earplug or a warning that the earplug would not be effective if he did not do so.

101.   Plaintiff Porter suffers from hearing loss and tinnitus.

*Russell Powell*

102.   Plaintiff Powell has been exposed to loud noises for extended periods of time while shooting firearms on ranges and while hunting from approximately 2000 to the present.

103.   Plaintiff Powell wore the 3M dual-ended earplugs during these activities. During such times, Plaintiff Powell was exposed to damaging, loud impulse, high-pitched sounds.

14

104.  Plaintiff Powell did not receive instructions to fold back the third flange on the opposite side of the use end of the 3M dual-ended earplug or a warning that the earplug would not be effective if he did not do so.

105.  Plaintiff Powell suffers from hearing loss and tinnitus.

*James Raby*

106.  Plaintiff Raby worked as a motor and engine operator for Helmrich and Payne, Inc. from at least 2010 to 2015. His responsibilities included working around industrial engines and other heavy equipment for extended periods of time.

107.  Plaintiff Raby wore the 3M dual-ended earplugs during his employment. During such times, Plaintiff Raby was exposed to damaging, loud impulse, high-pitched sounds.

108.  Plaintiff Raby did not receive instructions to fold back the third flange on the opposite side of the use end of the 3M dual-ended earplug or a warning that the earplug would not be effective if he did not do so.

109.  Plaintiff Raby suffers from hearing loss and tinnitus.

*Jacob Segovia*

110.  Plaintiff Segovia worked as a laborer for Capital Precast, LLC from approximately 2012 to 2015. His responsibilities included working with heavy equipment and machinery and in industrial environment for extended periods of time.

111. Plaintiff Segovia wore the 3M dual-ended earplugs during his employment. During such times, Plaintiff Segovia was exposed to damaging, loud impulse, high-pitched sounds.

112. Plaintiff Segovia did not receive instructions to fold back the third flange on the opposite side of the use end of the 3M dual-ended earplug or a warning that the earplug would not be effective if he did not do so.

113. Plaintiff Segovia suffers from hearing loss.

**David Sloas**

114. Plaintiff Sloas worked as a boilermaker for William Union Boiler from approximately 2000 to 2010. His responsibilities included working with industrial pumps, boiler unites, fans, and grinders for extended periods of time.

115. Plaintiff Sloas wore the 3M dual-ended earplugs during his employment. During such times, Plaintiff Sloas was exposed to damaging, loud impulse, high-pitched sounds.

116. Plaintiff Sloas did not receive instructions to fold back the third flange on the opposite side of the use end of the 3M dual-ended earplug or a warning that the earplug would not be effective if he did not do so.

117. Plaintiff Sloas suffers from hearing loss and tinnitus.

16

**Tiffany Smith**

118.  Plaintiff Smith worked as a laborer for Alatrade Food from at least 2015 to 2019 Her responsibilities included working around industrial processing machines for extended periods of time.

119.  Plaintiff Smith wore the 3M dual-ended earplugs during her employment. During such times, Plaintiff Smith was exposed to damaging, loud impulse, high-pitched sounds.

120.  Plaintiff Smith did not receive instructions to fold back the third flange on the opposite side of the use end of the 3M dual-ended earplug or a warning that the earplug would not be effective if she did not do so.

121.  Plaintiff Smith suffers from hearing loss and tinnitus.

**Bennett Snoddy**

122.  Plaintiff Snoddy remodeled homes in approximately 2020. His responsibilities included cutting metal using a regulating saw for extended periods of time.

123.  Plaintiff Snoddy wore the 3M dual-ended earplugs during this activity. During such times, Plaintiff Snoddy was exposed to damaging, loud impulse, high-pitched sounds.

124.  Plaintiff Snoddy did not receive instructions to fold back the third flange on the opposite side of the use end of the 3M dual-ended earplug or a warning that the earplug would not be effective if he did not do so.

17

125. Plaintiff Snoddy suffers from hearing loss and tinnitus.

*Rose Stinson*

126. Plaintiff Stinson worked as a general laborer for Nutmeg Mills Inc., from approximately 2009 to 2013 and as a spin manager for Amalie Arena in approximately 2013. Her responsibilities included working with heavy equipment and machinery and working in large crowds with live entertainment for extended periods of time.

127. Plaintiff Stinson wore the 3M dual-ended earplugs during her employment. During such times, Plaintiff Stinson was exposed to damaging, loud impulse, high-pitched sounds.

128. Plaintiff Stinson did not receive instructions to fold back the third flange on the opposite side of the use end of the 3M dual-ended earplug or a warning that the earplug would not be effective if she did not do so.

129. Plaintiff Stinson suffers from hearing loss and tinnitus.

*Stanley Tackett*

130. Plaintiff Tackett worked as a laborer for Dike County Co. from approximately 1998 to 2012. His responsibilities included operating heavy boat equipment and machinery for extended periods of time.

131. Plaintiff Tackett wore the 3M dual-ended earplugs during his employment. During such times, Plaintiff Tackett was exposed to damaging, loud impulse, high-pitched sounds.

132.  Plaintiff Tackett did not receive instructions to fold back the third flange on the opposite side of the use end of the 3M dual-ended earplug or a warning that the earplug would not be effective if he did not do so.

133.  Plaintiff Tackett suffers from hearing loss.

**Richard Zakarian**

134.  Plaintiff Zakarian was exposed to loud noises for extended periods of time while shooting firearms at a range in approximately 2013.

135.  Plaintiff Zakarian wore the 3M dual-ended earplugs during this activity. During such times, Plaintiff Zakarian was exposed to damaging, loud impulse, high-pitched sounds.

136.  Plaintiff Zakarian did not receive instructions to fold back the third flange on the opposite side of the use end of the 3M dual-ended earplug or a warning that the earplug would not be effective if he did not do so.

137.  Plaintiff Zakarian suffers from hearing loss and tinnitus.

**Arturo Zamora**

138. Plaintiff Zamora worked as a laborer for Superior Tire Service from approximately 2003 to 2006 and for Brown's Parkrose Point S Tire & Auto from approximately 2006 to 2012. His responsibilities included working with industrial compressors for extended periods of time.

139. Plaintiff Zamora wore the 3M dual-ended earplugs during his employment. During such times, Plaintiff Zamora was exposed to damaging, loud impulse, high-pitched sounds.

140. Plaintiff Zamora did not receive instructions to fold back the third flange on the opposite side of the use end of the 3M dual-ended earplug or a warning that the earplug would not be effective if he did not do so.

141. Plaintiff Zamora suffers from hearing loss and tinnitus.

**Defendants' Manufacture and Testing of the Combat Arms™ Earplugs**

142. Aearo Technologies was the global market leader in hearing and eye protection and was based in Indianapolis, Indiana. Aearo Technologies developed, marketed, and sold the Combat Arms™ earplug until being acquired by 3M in 2008 for $1.2 billion. Afterwards, 3M hired Aearo's employees and maintains it as a separate operating unit. Post-acquisition, the Combat Arms™ earplugs have been marketed and sold under the 3M brand. Because 3M acquired both the assets and liabilities of Aearo, Aearo and 3M are used interchangeably and all allegations against Aearo are directed as a matter of law against 3M.

143. Aearo developed dual-ended, non-linear (selective attenuation) Combat Arms™ earplugs for the specific purpose of providing a single set of earplugs that provide two options for hearing attenuation depending on how they are worn:

20



144.  The earplugs can be worn in an open or "unblocked" position (yellow end in) to

block, or at least significantly reduce, loud impulse sounds, while still allowing the user

to hear quieter noises. Alternatively, the earplugs can be worn in a closed or "blocked"

position (green end in) to block, or at least significantly reduce, all sounds, i.e., operate as

ordinary earplugs.

145.  Defendants knew these earplugs, at a minimum, required special instructions for

use as early as 2000.

146. At all relevant times, the Combat Arms™ earplugs had a tendency to

imperceptibly loosen in the wearer's ear, thus allowing damaging sounds to enter the ear

canal around the outside of the earplug. Specifically, the basal edge of the third flange of

the non-inserted end of the earplug is prone to press against some wearers' ear canals

and fold back to its original shape, thereby loosening the seal in their ear canals. Because the earplug is symmetrical, this occurs regardless of which end is inserted into the ear.

147.   Aearo learned of this problem when it completed testing of the Combat Arms™ earplugs. In fact, in February 2000, after the Combat Arms™ earplugs failed specification testing, Aearo employees rolled back the non-inserted yellow flanges to mitigate the loosening effect.

148.   The value and effectiveness of earplugs has been standardized under federal law through a Noise Reduction Rating ("NRR"). The testing and labeling of earplugs such as the Combat Arms™ earplugs to achieve an NRR is governed by federal regulations promulgated by the Environmental Protection Agency ("EPA") pursuant to the Noise Control Act, 42 U.S.C. § 4901 *et seq*. Specifically, 40 C.F.R. § 211.206-1 provides:

> The value of sound attenuation to be used in the calculation of the Noise Reduction Rating must be determined according to the "Method for the Measurement of Real-Ear Protection of Hearing Protectors and Physical Attenuation of Earmuffs." This standard is approved as the American National Standards Institute Standard (ANSI-STD) S3.19-1974.

149.   Further, 40 C.F.R. §211.204-4(e) requires that specific supporting information accompany hearing protection devices sold in the United States:

> The following minimum supporting information must accompany the device in a manner that insures its availability to the prospective user. In the case of bulk packaging and dispensing, such supporting information must be affixed to the bulk container or dispenser in the same manner as the label, and in a readily visible location.... **Instructions as to the proper insertion or placement of the device.**

(Emphasis added).

22

**Aearo's Test Results for the Combat Arms™ Earplugs Demonstrated the Need for a Warning and Special Fitting Instructions**

150. The NRR is supposed to represent the amount of sound attenuation experienced by a test group under conditions specified by the federal Noise Control Act's testing methodology.

151. In or around January 2000, Aearo began NRR testing on each end of the Combat Arms™ earplug. Rather than use an independent test lab, Aearo performed its testing in-house at its E-A-RCAL laboratory (also now owned by 3M). Aearo selected 10 test subjects, including some of its own employees. Aearo's test protocol involved testing: (1) the subject's hearing without an earplug; (2) the subject's hearing with the open/unblocked (yellow) end of the Combat Arms™ earplug inserted; and (3) the subject's hearing with the closed/blocked (green) end of the Combat Arms™ earplug inserted.

152. Aearo's own employees monitored the test results as the tests were performed, which allowed them to stop the testing at any point if they were not achieving the desired NRR. This violated the ANSI S3.19-1974 testing protocol. In fact, Aearo stopped the test of the green end of the Combat Arms™ earplug inserted after only 8 of the 10 subjects had been tested. At that point, the Combat Arms™ earplugs were failing expectations miserably. Aearo was expecting to achieve an NRR of 22 with the green end inserted, but in fact was on target to receive a 10.9 rating based on the experiences of the first eight subjects.

153. Despite stopping the test on the green end of the Combat Arms™ earplugs,

23

Aearo had the remaining two test subjects complete the test with respect to the yellow end of the Combat Arms™ earplugs only because Aearo liked the low NRR rating the test was indicating to that point. After completion, however, testing of the yellow end resulted in an NRR of -2, which falsely suggested that the earplugs actually amplified sound. Aearo thus knew that the test was inaccurate and needed to be repeated. Instead, Aearo changed the -2 NRR to a 0 NRR, and used that rating on its labels.

154.  After prematurely stopping the NRR test of the green end of the Combat Arms™ earplug, Aearo investigated the disappointing test results and discovered that because the stem of the earplug was so short, it was difficult to insert the earplug deep enough into the wearer's ear canal to obtain a proper fit as required by ANSI S3.19-1974, Section 3.2.3. *See*, Acoustical Society of America Standard Method for the Measurement of Real-Ear Protection of Hearing Protectors and Physical Attenuation of Earmuffs (ASA STD 1-1975).

155.  Aearo also discovered that when the green end of the Combat Arms™ earplug was inserted into the ear using the standard fitting instructions, the basal edge of the third flange of the yellow end pressed against the wearer's ear and folded backward. When the inward pressure of the earplug was released, the yellow flanges tended to return to their original shape, thereby loosening the earplug, often imperceptibly to the wearer. And, because the Combat Arms™ earplug was symmetrical, this same problem occurred when the earplug was reversed.

24

156.   Aearo later instructed test subjects to fold the flanges on the non-inserted end of the earplug back before inserting it into the ear.

157.   Using these manipulated fitting instructions, Aearo re-tested the green end of the Combat Arms™ earplugs starting in February 2000. During this re-test of the green end, test subjects folded back the yellow flanges of the earplug (essentially elongating the too-short stem) to allow them to insert the earplugs deeper into their ears to obtain a proper fit. Because the yellow flanges were folded back, the basal edge of the third flange no longer pressed against the subject's ear canal, and thus did not cause the earplug to loosen during the testing. Using this manipulated test protocol, Aearo achieved a 22 NRR on the green end of the Combat Arms™ earplug.

158.   Due to the symmetrical nature of the Combat Arms™ earplugs, the problem that affected the fit of the green end similarly affected the fit of the yellow end. The fact that Aearo's testing of the yellow end resulted in a -2 NRR meant that the earplugs (when used without the special instructions described above) did not provide a proper fit (as required by ANSI S3.19-1974, Section 3.2.3) between the ear canal of at least some of the subjects and the earplugs. As a result, some subjects had large standard deviations across trials on the yellow end test, which suppressed the NRR rating.

159.   Nevertheless, Aearo did not re-test the yellow end using the manipulated fitting instructions like it did on the green end, i.e., folding back the flanges on the green end of the earplug before inserting the yellow end into the ear.

25

160. Aearo did not re-test the yellow end because it knew that it would not be able to obtain a 0 NRR (much less the facially invalid -2 NRR).

161. Moreover, the need for the special fitting instructions for the Combat Arms™ earplugs is more important during real-life use than in a lab where the NRR tests are performed over the span of just a few minutes and the head of the test subject remains virtually motionless during the test. Wearers, such as Plaintiffs on the other hand, may wear the earplug for an extended period of time and are more active than test subjects in a lab.

162. Because the issue was imperceptible to the wearer, an improper fit would go undetected by those who wore them.

163. Defendants continued to sell the Combat Arms™ earplugs until 2016, at which time Defendants discontinued the earplug. *See* Discontinuation: 3M Combat Arms Earplugs Version 2 (Nov. 17, 2015)).

164. Defendants' failure to warn about the need for special fitting instructions for the Combat Arms™ earplugs caused Plaintiffs to suffer hearing loss and tinnitus.

165. At all times after 3M's acquisition of Aearo, 3M knew of, conspired with, and was complicit in Aearo's wrongful acts in marketing and selling the Combat Arms™ earplugs without warning of the need for modified fitting instructions.

## TOLLING OF STATUTES OF LIMITATIONS

166. Plaintiffs could not, by the exercise of reasonable diligence, have discovered

26

Defendants' wrongful acts as the cause of his injuries at an earlier time, because, at the time of these injuries, the cause was unknown to Plaintiffs. Plaintiffs did not suspect, nor did Plaintiffs have reason to suspect, the cause of these injuries, or the tortious nature of the conduct causing these injuries, until less than the applicable limitations period prior to the filing of this action.

167.  Further, the running of the statute of limitations has been tolled by reason of Defendants' fraudulent concealment: Through their affirmative misrepresentations and omissions, Defendants actively concealed from Plaintiffs the risks associated with use of the Combat Arms™ earplugs without adhering to the specific fitting instructions discussed above.

168.  Because of Defendants' failure to warn, Plaintiffs were unaware, and could not reasonably know or have learned through reasonable diligence that they had been exposed to the risks alleged herein, and that those risks were the direct and proximate result of Defendants' acts and omissions.

169.  Through Defendants' affirmative misrepresentations and omissions pertaining to the safety and efficacy of the Combat Arms™ earplugs, Plaintiffs were prevented from discovering this information sooner because Defendants misrepresented and continued to misrepresent the risks associated with using the Combat Arms™ earplugs without adhering to the specific fitting instructions discussed above.

27

## COUNT I: PRODUCT LIABILITY – FAILURE TO WARN

170. Plaintiffs incorporate by reference the paragraphs above as if fully set forth herein.

171. Defendants are the manufacturers and sellers of the Combat Arms™ earplugs.

172. The Combat Arms™ earplugs that Defendants manufactured, distributed, and sold lacked adequate warnings, instructions, or labels at the time they left Defendants' control.

173. Defendants failed to warn, failed to provide instructions, and failed to provide an adequate label that included the modified fitting instructions necessary for the Combat Arms™ earplug to fit correctly in the wearer's ear and create the seal necessary to block out damaging sounds.

174. Defendants had a duty to sell the Combat Arms™ earplugs with reasonable and due care for the safety and well-being of wearers, including Plaintiffs. Defendants breached that duty.

175. Defendants had a duty to provide adequate warnings and/or instructions to prevent the risks associated with the Combat Arms™ earplugs when worn in the ordinary course. Defendants breached that duty.

176. It was foreseeable to Defendants that the Combat Arms™ earplugs would be unreasonably dangerous if distributed without a warning regarding the risks of damage to the ear with an improper fit and/or modified fitting instructions.

177. Not only was it foreseeable, it was foreseen by Defendants. During testing,

Defendants discovered that because the stem of the earplug was so short, it was difficult

to insert the earplug deep enough into the wearer's ear canal to obtain a proper fit.

178. Defendants also discovered that when the green end of the Combat Arms™

earplug was inserted into the ear using the standard fitting instructions, the basal edge

of the third flange of the yellow end pressed against the wearer's ear and folded

backward. When the inward pressure of the earplug was released, the yellow flanges

tended to return to their original shape, thereby loosening the earplug, often

imperceptibly to the wearer. And, because the Combat Arms™ earplug was symmetrical,

this same problem occurred when the earplug was reversed.

179. Defendants had a post-sale duty to warn of the above alleged product-related

risks because Defendants knew or reasonably should have known that the Combat

Arms™ earplug posed a substantial risk of harm to wearers, including Plaintiffs, if used

without adhering to specific fitting instructions; the wearer who used the Combat

Arms™ earplug can reasonably be assumed to be unaware of the risk of harm of using

the Combat Arms™ earplugs without specific fitting instructions because the above

alleged loosening effect was imperceptible; a warning or instruction showing how to

correctly and safely use the Combat Arms™ earplug could have been effectively

communicated to and acted upon by the wearer to whom a warning or instruction might

be provided; and the risk of harm, including but not limited to hearing loss in wearers, is

sufficiently great to justify the slight burden of providing a warning or instruction. Defendants breached this duty by failing to provide a post-sale warning or instruction.

180. The Combat Arms™ earplugs contained no warnings, or in the alternative, inadequate warnings and/or instructions, as to the risk that the Combat Arms™ earplugs would allow damaging sounds to bypass the earplug thereby posing a serious risk to Plaintiffs' hearing unbeknownst to Plaintiffs.

181. The warnings and instructions that accompanied the Combat Arms™ earplugs failed to provide the level of information that an ordinary wearer would expect when using the Combat Arms™ earplugs in a manner reasonably foreseeable to Defendants.

182. Had Plaintiffs received a proper or adequate warning as to the risks associated with the use of the Combat Arms™ earplugs in the manner contemplated by Defendants, they would not have used them.

183. Additionally, and/or alternatively, had Plaintiffs received the modified fitting instructions that were used by Defendants during the testing, which were not disclosed to Plaintiffs, Plaintiffs would have followed the modified fitting instructions to ensure a proper seal to prevent damaging sounds from entering the ear canal.

184. Plaintiffs suffered injury and damage as a direct and proximate result of Defendants' failures to warn and/or provide adequate instructions regarding the dangerous condition of the Combat Arms™ earplugs that the Defendants manufactured, distributed, and sold.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request from Defendants, jointly and severally, compensatory damages, together with appropriate equitable relief, costs and attorneys' fees as follows:

A. Award of monetary damages, including compensatory relief, to which Plaintiffs are entitled at the time of trial in an amount exceeding $50,000;

B. Award of pre- and post-judgment interest;

C. Award of costs; and

D. Award of all such other and further relief as may be available at law or equity and may be proper under the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues so triable.

## ACKNOWLEDGMENT

The undersigned acknowledge sanctions may be imposed under Minn. Stat. § 549.211.

31

Dated: January 19, 2021                    Respectfully submitted,

By */s/ Alicia N. Sieben*
William R. Sieben (#100808)                Daniel Gustafson (# 202241
Alicia N. Sieben (#389640)                 Amanda M. Williams (# 341691)
Matthew J. Barber (#397240)                **GUSTAFSON GLUEK PLLC**
**SCHWEBEL GOETZ & SIEBEN, P.A.**          Canadian Pacific Plaza
5120 IDS Center                            120 South Sixth Street, Suite 2600
80 South Eighth Street                     Minneapolis, Minnesota 55402
Minneapolis, Minnesota 55402-2246          Telephone: (612) 333-8844
Telephone: (612) 377-7777                  dgustafson@gustafsongluek.com
bsieben@schwebel.com                       awilliams@gustafsongluek.com
asieben@schwebel.com
mbarber@schwebel.com

Richard M. Paul III *(pro hac forthcoming)*
Ashlea G. Schwarz *(pro hac forthcoming)*
**PAUL LLP**
601 Walnut, Suite 300
Kansas City, Missouri 64106
Telephone: (816) 984-8100
Rick@PaulLLP.com
Ashlea@PaulLLP.com

**ATTORNEYS FOR PLAINTIFFS**

32